**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 12 2004**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL A. MITCHELL,

      Plaintiff-Appellant,

v.

CITY AND COUNTY OF DENVER,
by and through the Board of Water
Commissioners; JOAN FUNK, in her
individual and official capacities,

      Defendants-Appellees.

No. 02-1263
(D. Colorado)
(D.Ct. No. 97-S-1938 (BNB))

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

---

Michael Mitchell, an African-American, claims the City and County of

Denver, through its Denver Board of Water Commissioners (Denver Water)

engaged in racial discrimination and harassment in violation of 42 U.S.C. §§ 1981

and 1983 (equal protection) and Title VII of the Civil Rights Act, 42 U.S.C. §

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

2000e *et seq.*[1]  Mitchell appeals the district court's grant of summary judgment in favor Denver Water on his claims.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

Mitchell began work at Denver Water in 1973 as a laborer and transferred to the Engineering Department in 1987.  At the time of this lawsuit, he was a Construction Inspector II - Step 7, overseeing construction contractors on Denver Water's projects.  Of Denver Water's nine construction inspectors, two were African-American: Mitchell and James Phillips.  The construction inspectors reported to any of four resident engineers depending on the project, but each inspector was assigned one of the resident engineers as a direct supervisor.  The resident engineers were supervised by Joan Funk, who in turn, reported to construction manager, James Batt, who reported to the director of engineering, Jon Diebel.

Generally, Mitchell alleges, between 1991 and 1998, Caucasian inspectors received promotions more quickly and were given more favorable assignments than he.  He also alleges he was subjected racial epithets because he is African-American.  Specifically, Mitchell points to the actions of his second-tier

---

[1] Mitchell's complaint also included claims of retaliation in violation of Title VII, breach of contract, and breach of an express covenant of good faith and fair dealing.  He does not appeal the district court's summary judgment disposition of those claims.

supervisor, Funk, as the significant source of his complaints.

## A. General Discriminatory Actions

Mitchell contends Funk treated him in a manner distinct from the way she related to other employees and her treatment interfered with his work. He claims, on a number of occasions, she improperly communicated directly with contractors on his projects thereby undermining his authority with the contractors and detrimentally excluding him from information important to his job functions. He also claims, in the earlier part of her tenure as his secondary supervisor, Funk harassed him by contacting him directly on work issues, rather than going through his supervisor. Later, she was sometimes rude to him and gave him the silent treatment.

Mitchell also alleges that between 1991 and 1993, Funk assigned him to difficult projects in an effort to see him fail. However, beginning around 1994, he claims Funk began assigning him less favorable jobs compared to those assigned Caucasian inspectors, describing them as smaller, low-value projects, offering fewer learning experiences and less training.[2] In 1997 and 1998, he asserts she unexpectedly and without justification pulled him off large, favorable jobs and replaced him with a Caucasian inspector. He also alleges Funk interfered with his training opportunities in early 1996, when she delayed the

---

[2] Mitchell alleges Phillips also was assigned to less favorable jobs.

paperwork needed for a training program, even though the delay did not prevent Mitchell from attending the training.

In a more miscellaneous vent, Mitchell claims in April 1994, Funk imposed parking restrictions at a location where he and Phillips parked. And, she fabricated stories about him speeding and driving erratically in a company vehicle in 1994, 1996 and 1997.

## B. Racial Statements

Mitchell also contends Funk made racial statements, but the factual basis for his claim is less than clear. He claims a co-worker relayed to him that Funk told his co-workers, "[t]hat nigger isn't going anywhere as long as he is under me," (R. Vol. 11 at 336) and "[t]hat nigger's not going to get anywhere as long as I'm his boss," once referencing Phillips and once Mitchell. (R. Vol. 3 at 735.) He alleges the Phillips reference occurred in 1992 or 1993, and the statement directed toward him in 1994 or 1995. However, there is no testimony from anyone who heard these statements directly, and those who are alleged to have heard them could not recall the incident. Also, in 1994 or 1995, Mitchell claims Funk told Kenneth Lochner, Mitchell's supervisor at the time, that "blacks always feel like they should be promoted ahead of others." He further alleges, during 1997, she told a racially inappropriate joke and, at some time during the same project, commented that black men were not the only men with "big ones," referencing her

boyfriend's penis. Edward Sandoval, Mitchell's co-worker, stated he heard Funk say, "[t]hese niggers act like they don't have to do nothing around here" in the maintenance garage. (R. Vol. 3, 896.) However, the alleged recipient of the comment denied Funk made the statement.

### C. Performance Evaluations

Mitchell also charges Funk detrimentally interfered with his performance evaluations in 1994 and 1996. He claims she changed his supervisor's comments in the 1994 evaluation for no reason. He admits, however, she did not change the overall performance rating of "good." In the 1996 evaluation, he complains she impermissibly solicited input from two design engineers, rather than relying solely on input from his supervisor.

### D. Filing of Administrative Charge and Lawsuit

On September 4, 1996, Mitchell filed an administrative charge against Denver Water with the Colorado Civil Rights Division (CCRD) and the Equal Employment Opportunity Commission (EEOC), alleging racial discrimination for failure to be promoted to "Inspector II-Step 9" (and receive the associated pay raise). On September 8, 1997, after obtaining a right-to-sue notice,[3] Mitchell filed a lawsuit in federal district court against Denver Water and Funk, in her

_____

[3] A right-to-sue notice is required to show "final agency action and exhaustion of administrative remedies and proceedings. . . ." COLO. REV. STAT. § 24-34-306(15) (2002).

individual capacity, alleging racial discrimination (disparate treatment) and racial harassment (hostile work environment) under Title VII, §§ 1981 and 1983, and denial of equal protection under § 1983. The district court consolidated Mitchell's case with a related case brought by Phillips.[4] On June 14, 2001, the district court granted summary judgment in favor of Denver Water on all of Mitchell's claims except his § 1981 racial discrimination claim. Applying a four-year statute of limitations to his § 1981 racial discrimination claim, the district court found he presented evidence of pretext sufficient to survive summary judgment. On reconsideration, in light of a recent unpublished Tenth Circuit decision holding a two-year limitation period applied to the § 1981 claim, the district court found insufficient facts to establish his claim within the two-year time frame and reversed that portion of its earlier holding, thus disposing of all Mitchell's claims. This appeal followed.[5]

## II. DISCUSSION

---

[4] On June 14, 2001, Phillips' § 1981 and Title VII claims survived summary judgment. On reconsideration, the district court dismissed Phillips's § 1981 claim, leaving only his Title VII claim. Although Phillips is not a party to this appeal, Mitchell relies on some of Phillips's allegations to establish a culture of discrimination at Denver Water.

[5] In his reply brief, Mitchell argues the district court erred in determining Funk was entitled to qualified immunity. Because he did not discuss the qualified immunity issue in his opening brief, he has waived this argument. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994). Consequently, the only remaining defendant is the City and County of Denver, through Denver Water.

We review *de novo* a grant of summary judgment. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.* "A disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). Once the movant demonstrates no genuine issue of material fact, the nonmovant is given "wide berth to prove a factual controversy exists." *Jeffries v. Kansas, Dep't of Soc. & Rehab. Servs.*, 147 F.3d 1220, 1228 (10th Cir. 1998) (quotation omitted). Unsupported conclusory allegations, however, do not create an issue of fact. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004), *petition for cert. filed*, (U.S. May 18, 2004) (No. 03-1557).

### A. Title VII Claims

#### 1. Jurisdiction

Initially, we must determine whether Mitchell's Title VII hostile work environment claim is properly before us. "A plaintiff must exhaust his administrative remedies before bringing suit under Title VII[.]" *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 (10th Cir. 1997). Requiring exhaustion of

administrative remedies "serves to put an employer on notice of a violation prior to the commencement of judicial proceedings. This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation." *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). A failure to file an administrative Title VII claim before bringing suit is jurisdictionally fatal. *Seymour v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir. 1997).[6]

"[W]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Martinez*, 347 F.3d at 1210 (quoting *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir. 1994)). A claim is considered "reasonably related" when "the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made." *Deravin v. Kerik,* 335 F.3d 195, 200-01 (2d Cir. 2003) (quotation omitted). This more lenient pleading standard contemplates the fact that

---

[6] The jurisdictional issue was not specifically raised below. Rather the parties incorporated these arguments into their discussion of the statute of limitations. Thus, the district court did not separately rule on Mitchell's exhaustion of administrative remedies as a jurisdictional question. The district court did, however, rule that Mitchell's allegations regarding his job assignments were not sufficiently related to the allegations in his EEOC claim, and therefore the job assignment allegations would not be considered.

administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel. *Id*. at 201. Thus, precise pleading is not required for Title VII purposes. *Id.* at 202. Mitchell contends his EEOC filing can be fairly construed to include a hostile work environment/racial harassment claim, and therefore, all allegations in his civil suit are deemed included in his administrative charge. Consequently, the district court should have considered all of his allegations in determining his Title VII claim. We disagree.

To determine whether the hostile work environment claim is reasonably related to the administrative charge, we look first to the language of the charge itself. The form for filing a Title VII claim is submitted jointly to the CCRD and the EEOC. The form contains several sections with boxes that may be checked or blanks that may be filled in by the complainant. In the section titled "Cause of Discrimination," Mitchell checked the boxes marked "race" and "retaliation." (R. Vol. 5 at 1334.) In the section titled "Date of Discrimination," he checked the box marked "continuing action." (*Id*.) However, in that same section, he filled in the blanks marked "earliest date" of discrimination and the "latest date" of discrimination with the same date, September 4,1996. (*Id*.) In the section provided for his statement of "Personal Harm," Mitchell stated: "on or about August 4, 1996, and continuing" Denver Water "fail[ed] to promote me . . .

-9-

because of my race/African American . . . and in retaliation for engaging in protected activity." (*Id*.) He supported this claim in his "Discrimination Statement," alleging: (1) he had always been a "satisfactory to above-satisfactory" employee, (2) three Caucasian males with less seniority and experience had been promoted in the last six months, (3) throughout this period he had consistently complained to his superiors regarding what he perceived to be discriminatory treatment, (4) he had filed a previous charge of discrimination around 1986, (5) Funk allegedly stated, "this nigger [Mitchell] ain't going anywhere as long as he works for me," and (6) he remained employed "at a lesser step than he should be." (*Id*. at 1334-35.) Finally, he requested relief in the form of a promotion to Inspector II-Step 9, back pay and benefits, and compensatory and punitive damages.

Reading Mitchell's EEOC charge liberally, we must conclude the investigation of his "failure to promote" claim could not reasonably be expected to lead to a hostile work environment/racial harassment claim. This is not a case where Mitchell simply neglected to attach a legal label to his underlying factual allegations. *See, e.g., Deravin,* 335 F.3d at 202 (absence of an explicit reference to race discrimination in EEOC complaint is not dispositive). Nothing in Mitchell's EEOC complaint indicates a hostile work environment.

To lay a factual foundation for a hostile work environment claim, Mitchell

must allege facts indicating a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir. 1998) (quotation omitted). Mitchell's EEOC charge contains no factual allegations of treatment in manner or degree sufficient to allege a hostile work environment. Consequently, Mitchell's Title VII hostile work environment claim (titled "racial harassment" in his civil complaint) is dismissed for failure to exhaust administrative remedies. As a result, we consider only his Title VII racial discrimination/failure-to-promote claim.

2. Statute of Limitations

Under Title VII, in states that have a state agency to review employment claims such as Colorado, charges must be filed with the state agency within 300 days following the alleged discriminatory acts. 42 U.S.C. § 2000e-5(e)(1); Colo. Rev. Stat. §§ 24-34-301 *et seq.* Because Mitchell's allegations ranged from 1991 through 1998, the district court was required to determine whether the alleged acts were discrete violations within the 300-day time frame, or whether the allegations as a whole constituted a "continuing violation" of unfair employment practices. To do so, the district court applied the analysis set forth in *Purrington v. University of Utah*, considering: (1) whether the alleged acts involve the same

-11-

type of violation; (2) whether the acts were recurring versus isolated; and (3) whether the acts have the degree of permanence which should alert the employee to the duty to assert his rights. 996 F.2d 1025, 1028 (10th Cir. 1993). Under this analysis, the district court concluded Mitchell had not shown the acts alleged prior to the Title VII limitation period were sufficiently related to create a continuing violation. Thus, even though Mitchell's complaint refers to activity going back to 1991, the district court considered only those acts that occurred within the 300 days prior to the filing of his administrative charge, November 9, 1995, to September 4, 1996.

Mitchell argues the Supreme Court's holding in *National R.R. Passenger Corp. v. Morgan*, decided after the district court's decision in this case, substantially abrogates the continuing violation doctrine, thus negating the *Purrington* analysis and requiring consideration of each of his allegations. 536 U.S. 101 (2002). While we agree *Morgan* has changed the Title VII landscape, it does not change the result for Mitchell.

As we recently observed in *Martinez v. Potter*:

[*Morgan*] effected fundamental changes to the doctrine allowing administratively unexhausted claims in Title VII actions . . . . [U]nexhausted claims involving discrete employment actions are no longer viable. *Morgan* abrogates the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers, and replaces it with the teaching that each discrete incident of such treatment constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted.

-12-

Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful 'employment practice.'

347 F.3d 1208, 1210 (10th Cir. 2003) (citations and quotations omitted). However, should a Title VII claim allege a hostile work environment, "a court may, for purposes of determining liability, review all such conduct, including those acts that occur outside the filing period." *Morgan*, 536 U.S. at 116. This is because a hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. *Id.* Here, however, Mitchell's failure to exhaust his administrative remedies precludes his hostile environment claim. What remains is his claim of discrimination based on Denver Water's failure to promote him. A failure to promote is a discrete act subject to the 300-day statutory time limit for filing a claim. Accordingly, we affirm the district court's decision to limit its consideration to conduct alleged between November 9, 1995, through September 4, 1996.[7]

### 3. Failure to Promote

In his EEOC charge, Mitchell alleged Denver Water failed to promote him

_____

[7] Because Mitchell's hostile work environment claim could not pass jurisdictional muster, consideration of Mitchell's post-charge allegations is also precluded. The rule enunciated in *Morgan* "is equally applicable . . . to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint." *Martinez*, 347 F. 3d at 1210-11. Consequently, claims based on activity alleged after the administrative charge was filed will not be considered for the purposes of Mitchell's Title VII claims.

or give him an accelerated pay increase because of his race.

> Under the familiar three-step allocation of burdens of proof mandated by *McDonnell Douglas*, a plaintiff alleging a failure-to-promote claim must initially establish a prima facie case, demonstrating that: (1) [h]e was a member of a protected class; (2) [h]e applied for and was qualified for the position; (3) despite being qualified [h]e was rejected; and (4) after [h]e was rejected, the position was filled.  If the plaintiff carries [his] burden of establishing a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action. This shifts the burden back to the plaintiff to proffer evidence that the employer's reason is pretextual.

*Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003) (citations omitted).

While Mitchell belongs to a protected class and positions were filled with Caucasian inspectors who received promotions sooner than he did, Denver Water claims Mitchell cannot demonstrate he was qualified for the promotion to Inspector II-Step 9 under its civil service system of promotion and pay increases. We agree.

Denver Water's pay and promotion policies provide that the job classification of Inspector II has nine steps, each representing a five percent pay increase.  Employees can progress from step to step and obtain pay raises if their performance meets a satisfactory level.  A specific time is associated with step progression: one year between steps one through five, two years between steps five through seven, and three years between seven through nine.  Employees cannot skip steps for quicker promotion and raises, but may obtain an

-14-

"accelerated step" increase. An accelerated step increase is confined to employees who have worked fifty percent of the time required for promotion and have "an overall minimum annual rating of 'Frequently Exceeds Expectations'" for Steps 1-8. (R. Vol. I at 199.) An increase to Step 9, therefore, requires two consecutive years of an overall rating of "Consistently Exceeds Expectations," or three consecutive years of "Frequently Exceeds Expectations." (*Id.*)

Between 1991 and 1996, Mitchell received an overall "good" performance review, and was promoted from Step 6 to Step 7 in 1996. Even assuming his ratings improved to "Frequently Exceeds Expectations" for every subsequent evaluation, he could not progress from Step 7 to Step 8 until 1998, at least a year and a half later, and could not reach Step 9 until 2001. Accordingly, Mitchell failed to establish his eligibility for increased pay or sufficient qualification for the Step 9 position.

**B. Claims Under 42 U.S.C. § 1981, 42 U.S.C. § 1983 and Equal Protection. [8]**

---

[8] 42 U.S.C. § 1981 provides, in relevant part:
(a) All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .
(b) For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

Mitchell claims Denver Water engaged in two types of discrimination in violation of 42 U.S.C. § 1981, 42 U.S.C. § 1983 and the Equal Protection Clause: (1) racial discrimination/disparate treatment and (2) racial harassment/hostile work environment. These claims are not subject to the exhaustion of remedies requirement found in Title VII. Therefore, his remaining claims are properly before us.

### 1. Disparate Treatment

A claim of disparate treatment encompasses "a situation where the employer simply treats some people less favorably than others because of their race, color, religion or national origin." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (quotation omitted). The elements of a prima facie case are the same whether the claim is brought under Title VII, § 1981 or § 1983. *Id.* at 1162. To establish a prima facie case of racial discrimination under § 1981 Mitchell must demonstrate (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) similarly situated employees were treated differently. *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th

---

42 U.S.C. § 1983 provides:
Every person who, under color of any . . . custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Cir. 1998).  Mitchell's disparate treatment claim under § 1981 is subject to a four

year statute of limitations.[9]  *Harris*, 300 F.3d at 1193.  Consequently, we consider

the conduct alleged between September 8, 1993, and September 8, 1997, the date

Mitchell filed his initial complaint.  A two-year statute of limitations applies to

Mitchell's § 1983 claim.  *See Riel v. Reed*, 760 F.Supp. 852, 854 (D.Colo. 1991)

("Actions under 42 U.S.C. § 1983 are governed by Colorado's residual statute of

limitations, COLO. REV. STAT. § 13-80-102(1)(I) (1987).")[10]  Because our analysis

of disparate treatment is the same under § 1981 and § 1983, rejection of

Mitchell's claim under § 1981's four year statute of limitations necessitates the

failure of Mitchell's § 1983 claim as well.  Even assuming Mitchell demonstrated

the prima facie case described above, he has failed to establish another necessary

element of his claims against Denver Water—municipal liability.  As discussed

below, the absence of municipal liability defeats his disparate treatment claims.

2.      Hostile Work Environment

Under § 1981, a prima facie case of racial harassment/hostile work

_____

[9] At the time the district court considered the appropriate statute of limitations for Mitchell's § 1981 claims, there was conflicting authority as to whether a two or four year limitations period applied.  Pursuant to our decision in *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1188-89 (10th Cir. 2002), that controversy is laid to rest.  The two year period applies to claims under § 1981(a), while the four year statute of limitations, 28 U.S.C. § 1658, applies to claims falling under § 1981(b) – the source of Mitchell's claim.

[10] Mitchell's equal protection claim against Denver Water is subsumed within his § 1983 claims.  *Starret v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989).

environment requires Mitchell to show, "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (internal citations omitted).[11]  He must demonstrate "that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 923 (10th Cir. 2001) (internal quotations and citations omitted).  We review all of Mitchell's allegations, both prior and subsequent to the claim, as he has alleged at least one act contributing to that hostile environment within the statutory time period.  *Morgan*, 536 U.S. at 117-18.  Again, however, the success of his hostile work environment claims against Denver Water depends on his ability to establish municipal liability.  Considering all his allegations in the light most favorable to his cause, he has failed to do so.

---

[11]  Although it is well-established that sexual or racial harassment can be actionable under § 1983, *see Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992); *Ryan v. City of Shawnee*, 13 F.3d 345, 349-50 (10th Cir. 1993), it is not clear what constitutes a § 1983 hostile work environment.  *See Stepp v. Proctor*, 13 F.3d 407, 1993 WL 498172 (10th Cir. 1993) (unpublished opinion).  This Court need not determine whether the Title VII standards apply or if the record supports Mitchell's claims under a standard peculiar to § 1983 because Mitchell fails to establish municipal liability.

### 3. Municipal Liability

In *Monell v. New York City Department of Social Services,* the Supreme Court held that municipalities can be sued as "persons" under 42 U.S.C. § 1983. 436 U.S. 658 (1978). However, the Court held that municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory for merely employing a tortfeasor. *Id.* at 691. Rather, municipalities are subject to liability only for their *official* policies or customs. *Id.* at 694. In *Randle v. City of Aurora*, we applied *Monell* to actions brought under 42 U.S.C. § 1981 as well as § 1983 claims. 69 F.3d 441, 446 n.6 (10th Cir. 1995) (all references to § 1983 liability with regard to the issues of custom and policy also address the question of whether the City of Aurora can be held liable under § 1981).

Because Denver Water is a municipal agency, Mitchell must also demonstrate the discrimination was caused by a custom or policy within the meaning of *Monell*. *Id*. at 446. In the instant case, Mitchell does not claim Denver Water had an official written policy of racism. Instead, he argues Denver Water is liable for Funk's actions because she was acting pursuant to a custom of discriminatory employment practices.

A custom is a "persistent and widespread" practice which "constitutes the standard operating procedure of the local governmental entity." *Jett v. Dallas*

-19-

*Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989) (quotation omitted).[12]  It may also be a series of decisions by a subordinate official of which the supervisor must have been aware.  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 130 (1988) (plurality). Liability attaches in such a case, because "the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower- ranking official."  *Id.*  "But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority."  *Id*.

The district court determined Mitchell failed to show a widespread custom of discrimination because his complaints were internally investigated, "the length of time over which Plaintiffs' allegations took place and the number of individuals employed by Denver Water."  (R. Vol. 5, Doc. 16 at 14.)  On reconsideration, the district court again rejected Mitchell's claims of municipal liability, finding Phillips' allegations were "not sufficiently similar" to Mitchell's to demonstrate a widespread policy and "the highly particularized allegations of misconduct, isolated and sporadic acts of discrimination [were] directed at specific individuals."  (R. Vol. 5, doc. 21 at 5-6.)

Relying on *Melton v. City of Oklahoma City*, Mitchell argues the district

---

[12]  Mitchell does not argue that Funk had sufficient policy-making authority to establish municipal liability.

court erred because Phillips' allegations were sufficient to establish a question of fact as to whether racial discrimination was a custom at Denver Water. 879 F.2d 706, 725 n.26 (10th Cir. 1989), *rev'd in part on other grounds*, 928 F.2d 920 (10th Cir. 1991). That footnote contains a suggestion that when others experience the same retaliation for the same act, such a coincidence might suggest a pattern or practice, but of real significance was the city's litigation posture. Melton, a police officer, was fired for exercising his First Amendment rights; he gave what he believed to be exculpatory information to defense counsel and testified at trial. *Id*. at 711-12. The city conceded the policy issue, so we concluded "the firing was done pursuant to a 'municipal policy' which was ratified by the 'final policymaking authority.'" *Id*. at 725. The *Melton* dicta is not controlling, but if it were, the Phillips allegations, taken as a whole, are insufficient to forestall summary judgement.

As we observed in Melton, "[t]he touchstone for determining official policy is distinguish[ing] acts of the *municipality* from acts of *employees* of the municipality, and thereby mak[ing] clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 723 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)). The acts complained of here center on one person, Funk, and her treatment of two employees over seven years. During that time she allegedly made four racial

comments to someone other than Mitchell, caused delay in filing his paperwork for a training session and required Phillips to take a late flight to a training session, twice reported Mitchell and once reported Phillips for a driving violation, and on several occasions gave Mitchell and Phillips unfavorable assignments. While we do not condone Funk's alleged conduct, it does not reach the level of a policy or custom at Denver Water.

Mitchell also argues the district court erred because he has alleged a municipal failure to act or train, and he demonstrated "the agency acted with deliberate indifference to the rights of those affected."  (Appellant's Br. at 42.) Mitchell claims both he and Phillips complained to supervisors about Funk's treatment, but Denver Water never meaningfully investigated their grievances. We disagree.

Denver Water's policies provide procedures for employee complaints about prohibited discriminatory conduct.  Mitchell did not file an internal complaint under these policies until 1996,[13] when he spoke with Ted Williams, the EEO

---

[13]  It appears Phillips complained to Jon Diebel, Funk's secondary supervisor, some time in 1994 regarding Funk's transfer of Phillips to another job and a driving violation.  In response, Diebel interviewed the four resident engineers and then held a "counseling interview" with Funk wherein they discussed seven complaints made by the resident engineers about her performance.  (R. Vol. 2 at 510.)  One of the complaints related to two comments "relating negatively to blacks."  (*Id*. at 511.)  Funk was told "to be more sensitive in how she conducts herself as far as behavior and verbal discussions."  (*Id*.)  No other action was taken, but her performance was monitored for a period of time.

Officer. Williams conducted an investigation including interviews with Mitchell, Funk, supervisors and co-workers. Although two of Mitchell's supervisors reported they thought Funk treated Mitchell unfairly, neither supervisor could give a specific example. He ultimately determined there was no discrimination. Careful review of the record reveals no indication that the management at Denver Water was deliberately indifferent to Mitchell's complaints. *See Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1249-50 (10th Cir. 1999) (acts of sexual harassment by a student directed solely at another student do not demonstrate a custom or policy of the school district to be deliberately indifferent to sexual harassment as a general matter).

## III. CONCLUSION

Summary judgment in favor of Denver Water was appropriate on Mitchell's Title VII claims because he failed to exhaust his administrative remedies prior to claiming a hostile work environment and he failed to establish a prima facie case on his Title VII claims of disparate treatment due to his race. Summary judgment was also appropriate on Mitchell's 42 U.S.C. §§ 1981 and 1983 claims in the absence of municipal liability. AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

-23-