Brendon FOX, Plaintiff,

v.

**WICHITA STATE UNIVERSITY,**
Defendant.

No. 06–2134–JAR.

United States District Court,
D. Kansas.

May 23, 2007.

Lawrence W. Williamson, Jr., Uzo L. Ohaebosim, Shores, Williamson & Ohaebosim, LLC, Wichita, KS, for Plaintiff.

Brooke Bennett Aziere, Jeffrey P. Degraffenreid, Foulston Siefkin LLP, Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROBINSON, District Judge.

This matter comes before the Court on defendant's Motion for Summary Judgment (Doc. 35). In this motion, defendant seeks summary judgment on all of plaintiff's employment discrimination claims. Defendant has also filed a Motion to Determine Wichita as Place of Trial (Doc. 41), asking that trial in this case be held in Wichita, Kansas rather than Kansas City, Kansas as plaintiff has requested. Both matters are fully briefed, and the Court is now prepared to rule. For the reasons set forth below, the Court grants defendant's Motion for Summary Judgment. Accordingly, defendant's Motion to Determine Wichita as Place of Trial is denied as moot.

## I. Uncontroverted Facts

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff. Plaintiff Brendon Fox is an African–American who has been employed by defendant since August 2000. Plaintiff was initially hired as a police officer trainee. After he attended the Kansas Law Enforcement Training Center, he became a commissioned police officer in February 2001. In early summer 2005, defendant had two openings for the job of Captain in the Wichita State University Police Department ("WSUPD"). Plaintiff applied for both Captain's positions but was not hired.

*Plaintiff's Educational and Work History*

In 1976, plaintiff graduated from high school and joined the Air Force. He served for four and a half years, stationed in Wichita, Kansas. During his time with the Air Force, plaintiff did not supervise any employees "to the extent where [he] could write evaluations." In 1983, plaintiff joined the Air National Guard. Plaintiff did not supervise employees in his position with the Air National Guard, but he did work as an acting first sergeant directly under the commander, in which he was responsible for "command oriented" programs. Plaintiff retired from the Air National Guard in 1996 as a Technical Sergeant.

While in the Air Force, plaintiff enrolled in the Community College of the Air Force where he took typing classes. Then in the late 1970's, plaintiff attended Wichita State University ("WSU") where he enrolled in political science classes. Plaintiff did not take any courses related to law enforcement procedures or criminal justice at either institution. In 2000, plaintiff be-

gan taking courses at Southwestern College and graduated with a Bachelor of Science degree in business quality management. He did not take any courses pertaining to law enforcement or criminal justice at Southwestern College. Plaintiff then enrolled in a Masters of Business Administration ("MBA") program at Webster University. He later transferred to Southwestern College and completed his MBA at that school in 2005. Throughout his scholarship, plaintiff has never obtained higher education relating to criminal justice or other types of police work.

In 1980, after plaintiff left the Air Force, he moved to Dallas, Texas, where he worked as an assistant manager at a clothing store. In or about 1983, plaintiff formed a fashion merchandising company named Fox and Dunn. The company put on about five fashion shows over the course of two years. Plaintiff's resume states that he managed sixteen "front line" employees, but this company did not have employees. Rather, the company hired models as independent contractors. In 1988, plaintiff began employment with the Wichita Police Department ("WPD") in the records section. He started out working in the typing pool, and then he answered phones and filed information on cases. Plaintiff received no formal training for this position in the records section. Plaintiff later worked in a position entering case information into a computer. Then he became a dispatcher, providing information over the police channel such as license plate and vehicle checks and criminal history checks using the National Crime Information Center database. In 1998, plaintiff left the WPD.

Plaintiff then began working as a financial planner for Guardian Insurance Company. He worked there for about six to nine months writing insurance policies, and then he was employed by Strategic Financial Concepts for about six months, where he was an insurance agent. Beginning in about 1992, plaintiff also worked part time as a security guard for K–Mart, J.C. Penney, and a shopping mall. In 1999, plaintiff was employed by Silva Security as a security guard at the Wichita Greyhound Park. Plaintiff did not receive any training other than on-the-job training in these security positions, but he did attend "security classes" when he was employed by Silva. In his position with Silva, plaintiff worked in a two-person team in which he was the senior security guard. Plaintiff believes that he supervised this other employee, although he did not have the authority to fire her or conduct performance appraisals for her.

In 1999, plaintiff applied to become a law enforcement officer with the WPD, but he did not pass the initial screening. Then plaintiff again worked briefly for the records department at the WPD until he was terminated from that position in February 2000. Plaintiff has also served as a volunteer for Communities United Credit Union. Plaintiff was the chair of the "supervisory committee," and he "supervised other volunteers" in that capacity. In 2000, plaintiff was hired by the WSUPD, where he continues to work as a police officer.

### Captain Positions in the University's Police Department

In 2005, two positions of Captain in the WSUPD became open. The position of Captain is the second highest ranking position in the police department, reporting to the Chief of Police, Paul Dotson. There are two Captains positions in the department, one heading the Operations Division and one heading the Support Division. During the relevant time period, the Operations Captain managed four sergeants, twelve commissioned police officers, four safety officers, two detectives, and one public administrator. The Support Captain managed one sergeant, one supervisor, one administrative specialist,

two dispatchers, one senior administrative assistant, and twenty-eight student cadets.

In order to hire someone for an available employment position at WSU, the department with the opening must submit a "Request to Fill" form and a position description to the budget office for approval. When both of these forms are approved, the Human Resources Department employment staff can open the vacancy. Chief Dotson followed this process for filling the Captain positions in 2005. He filled out the "Request to Fill" form, and the Human Resources Department classification manager prepared the position description.

Because the position of "University Police Captain" is a state classified position, there are certain minimum qualifications required by the state. In this case, the state's minimum qualifications are: "A high school diploma or equivalent, valid driver's license, and five years experience in general law enforcement, including two years of administrate [sic] or supervisory experience. Education in criminal justice, fire science, or law enforcement may be substituted for experience as determined relevant by the agency." The position description that was filled out by the Human Resources Department classification manager, listed certain job duties and requirements for the position, but those requirements may or may not be the same as the state's minimum qualifications. In the Captain position description, the section listing the "minimum amounts of education and experience" necessary for the position states "as required by the Civil Service qualifications for University Police Captain."

WSU also uses "preferred qualifications" for some positions, including the Captain positions at issue in this case. These preferred qualifications are developed between the Human Resources Department and the supervisor of a department, and then are placed on a selection matrix. Once it is determined that an applicant meets the minimum qualifications of a position, the selection matrix criteria are applied objectively to measure the qualities of each application. In early June 2005, when Chief Dotson began the process of filling the Captain positions, he emailed Cyndy Hodge, an employee with the Human Resources Department, information about the preferred qualifications for these positions. The email stated that Chief Dotson preferred five years supervisory and management experience, which he defined as working as either a sergeant or lieutenant and above. He also wanted someone with a graduate degree in criminal justice and training in modern leadership and management techniques. Before Chief Dotson was given any of the names of applicants who met the minimum qualifications, he and Hodge had determined that five objective factors would be placed on the selection matrix. First, if a qualified applicant had achieved a graduate degree or was in the process of completing a graduate degree related to law enforcement, he or she could receive up to 300 points.[1] Second, the qualified applicant

---

1. Plaintiff attempts to controvert this fact by pointing to the selection matrix. (Doc. 39, Ex. 1.) The selection matrix states "graduate degree or in progress for completion," and does not state that this degree must be law enforcement related. However, according to the testimony of both Chief Dotson and Hodge, both understood that this criterion referenced graduate education related to law enforcement. Indeed, Chief Dotson states: "Although the selection matrix did not specifi-

cally state in writing that the educational and management criteria were to be law enforcement specific, this was our intent in creating the criteria and this is the manner in which those criteria were scored." Notably, the selection matrix was an internal document created to score interviewees; it was not published as part of the job description or criteria. Moreover, the minimum qualifications for the position specifically include educational expe-

could receive up to 150 points if he or she had earned an undergraduate degree related to law enforcement.[2] Third, the qualified applicant could received up to 300 points for having at least five years of supervisory experience of greater than twenty employees. Fourth, if the qualified applicant had supervisory or management experience over fewer than twenty officers, he or she could receive up to 225 points.[3] Finally, the qualified applicant could receive up to 225 points if he or she had university police experience. Hodge approved these criteria on the selection matrix.

As the next step in the hiring process, once the position description is completed, the position is posted on the state's human resources and payroll website, called SHARP. The position is also posted on the recruiting website, called HRePartners, at which individuals can create an online application for the position. Afterwards, the Human Resources Department waits for the submission of applications. Once the period for taking applications expires, a "vacancy coordinator" reviews the applications to see if the individual applicant meets the minimum qualifications for the position. If the applicant meets the minimum qualifications, the vacancy coordinator forwards the name of that applicant to the supervisor of the department with a link to that individual's application.

### Application for the Captain Positions

Sometime in early June 2005, plaintiff learned of the available Captain positions from an email sent by Chief Dotson. Plaintiff then went to the HRePartners website, filled out two applications for the Captain positions, and uploaded information from a resume. Hodge was the vacancy coordinator in this case who reviewed the applications for the Captain positions, determining if each applicant met the minimum qualifications. She knew the minimum qualifications for the position of University Police Captain from obtaining the specifications from the state's public website. Hodge testified that it is her job to apply the minimum requirements as written. As Hodge understood the minimum qualifications from the state specifications, they required that an applicant have at least two years of supervisory experience over commissioned law enforcement officers. She applied this standard to each application for the Captain positions.

Hodge reviewed forty-four applications for the two Captain positions, and she determined that plaintiff and thirty-six other applicants did not meet the minimum qualifications for the positions as provided in the state specifications. Hodge determined that plaintiff did not meet the minimum qualifications because he did not have two years supervisory experience over commissioned law enforcement officers. Hodge testified that when reviewing applications for supervisory experience, an

rience related to law enforcement as a substitute for experience. Nothing in the minimum qualifications or posted job position indicated that other college or graduate experience met the qualifications.

**2.** Plaintiff also attempts to controvert this fact by showing that the selection matrix states "undergraduate degree earned" without reference to law enforcement. As stated above, Chief Dotson and Hodge both understood that

this preferred qualification referenced an undergraduate degree related to law enforcement.

**3.** Plaintiff again attempts to controvert this fact with the selection matrix that describes this preferred qualification as supervising "employees" rather than officers. Again, as shown by the testimony of Chief Dotson and Hodge, it was understood that the management criterion was law enforcement specific.

applicant does not necessarily have to have the title, "supervisor," but the application has to "spell out" exactly what type of supervisory experience the applicant possesses. Plaintiff's application states that he has served for five years as a police officer for the WSUPD, but he has never served as a sergeant, lieutenant, captain, or in any other supervisory role over commissioned police officers. Plaintiff testified that during his employment with the WSUPD, he would fill in as an "acting supervisor." However, his application states that plaintiff has never supervised any employees while employed with the WSUPD. Where the application states "Number of Employees Supervised" for this particular employment, plaintiff answered "0." Additionally, in his deposition testimony, plaintiff agreed that he had "no relevant supervisor experience" in a police force. The application further indicates that plaintiff worked for the WPD as a clerk where he did not supervise any employees. It also reads that he worked for Silva Security as a security officer, supervising one employee in that position, and that he supervised four employees as a volunteer at Communities United Credit Union.

In reviewing his application, Hodge also found that plaintiff did not have any relevant education in criminal justice, fire science, or law enforcement. Plaintiff's application lists his educational history including his earning an undergraduate degree and an MBA, but does not indicate that he has any education in criminal justice, fire science, or law enforcement. Plaintiff admits that he has never taken courses in criminal justice or other types of police work. Hodge based her decisions regarding which applicants met the minimum qualifications for the positions upon the information provided in the applications. She did not call plaintiff or any other applicant to ask questions about the information in their applica-

tions. Hodge assumed that the information submitted by plaintiff on his application was complete and accurate.

Among the thirty-six other applicants that Hodge determined did not meet the minimum qualifications for the positions were a number of plaintiff's co-workers at the WSUPD. Sergeant Ed Catlin, who had worked for the police department for over twenty years, was determined to be not qualified for the positions because he had been in a supervisory position as a Sergeant for less than two years. Although Larry Keller had been an employee of the police department for eighteen years and has supervised numerous non-commissioned safety and security officers and dispatchers, Hodge determined that he was not qualified because he had not supervised commissioned police officers. Chris Mai, an employee of the department who worked as a Safety and Security Officer and did not supervise anyone in that position, was also determined by Hodge as not minimally qualified for the positions.

Hodge did determine that seven applicants met the minimum qualifications for the positions. These applicants were Sara Morris, Cecil Hashenberger, David McCullough, Leon Patterson, Bruce Patton, Terry Powers, and Daniel Wear. Morris was qualified with her more than twenty years experience with the WPD, where she served for more than five years as a Lieutenant and one year as a Sergeant. At the WPD, she supervised more than twenty-five employees. She also has a Masters degree in Criminal Justice and an undergraduate degree in Correctional Administration. Hashenberger met the qualifications as a fourteen year veteran of the WSUPD who had worked as a Sergeant and supervised employees. Previously, he worked for ten years as a police officer for the City of Hays, Kansas. McCullough was minimally qualified as a thirty-three

year veteran of the WSUPD and a Detective/Sergeant who supervised employees. Also, he had studied criminal justice, and he was working on a Master's degree in Public Administration. Patterson was qualified for the positions as a nine-year veteran of the WSUPD and a former Deputy Sheriff, supervising law enforcement officers in that position. He had also studied law enforcement at two community colleges. Patton met the minimum qualifications because he had worked twenty-six years for the WPD, supervising up to thirty-six employees in that capacity. Powers was qualified as a twenty-five year veteran of the Haysville Police Department where he was a Captain responsible for supervising twenty-nine employees. Wear met the qualifications because he served more than twenty years with the Air Force in a variety of capacities related to law enforcement and security, including five years as a Police Shift Sergeant. Wear also held numerous other positions with the Air Force involving supervision of up to thirty co-workers.

### Applying the Selection Matrix Criteria

After Hodge determined that these seven individuals met the minimum qualifications, she then sent Chief Dotson a hyperlink to the applications for one of the Captain positions. She also sent a second hyperlink containing the names of only the internal candidates for the other position.[4] Chief Dotson did not have access to the applications of any of the other applicants. Upon receiving the names of the seven applicants who met the minimum qualifications, Chief Dotson applied the selection matrix criteria that he and Hodge had previously determined were the "preferred qualifications" for the positions, as was described above, to the seven qualified applicants. The selection matrix criteria were not applied to plaintiff because his name was not sent to Chief Dotson as one of the seven applicants possessing the minimum qualifications. Applying the selection matrix criteria to the seven applicants who met the minimum qualifications, the scores were as follows. Morris received 300 points for her Master's degree in Criminal Justice and another 300 points for having supervisory experience over more than twenty employees. She did not receive any points for her undergraduate degree because it was not related to law enforcement, and she received no points for university police experience because she had never worked in that field of law enforcement. Therefore, Morris received a total of 600 points from the selection matrix criteria, the highest score of the seven qualified applicants. Hashenberger and Patterson both received 550 points for having managed fewer than twenty commissioned law enforcement officers and for university police experience. McCullough was awarded 375 points for having an undergraduate degree in Criminal Justice and for his university police experience. Powers and Wear each received 300 points for having five years of supervisory experience or managing more than twenty employees. Patton was awarded 225 points for having five years of managing fewer than twenty employees.

### Interviewing the Applicants and Hiring the Captains

The three applicants with the highest scores, Morris, Hashenberger, and Patterson, were then interviewed by a four-person search committee made up of Dr. Paul Cromwell, Dr. Cheryl Anderson, Shan Rao, and Hodge. The search committee asked a series of questions that had been approved by the Human Resources Department and scored the applicants based on their answers. Chief Dotson also interviewed these three applicants separately. After the interviews were conducted, both

---

4. Only internal applicants were eligible for the second Captain position.

the search committee and Chief Dotson rated Morris as the best qualified applicant, Hashenberger as the second most qualified, and Patterson as the third most qualified. Therefore, Morris and Hashenberger were offered the positions as Captain, and they both accepted.

After plaintiff learned that he would not be interviewed for the Captain positions, he called Hodge and asked her why he was not selected for an interview. Hodge told plaintiff that he did not meet the minimum qualifications for the positions. While plaintiff believes that he was one of the most qualified of the applicants for the Captain positions because he has an MBA and he knows of other applicants who did not have a Master's degree, Chief Dotson does not believe that an MBA should be given weight when hiring law enforcement management personnel.

### Diversifying the Wichita State University Police Department

Among the law enforcement officers who have served as supervisors in the WSUPD, Hodge is not aware of any African–Americans who have held such a position. Chief Dotson testified that to the best of his knowledge, there has never been an African–American Captain in the WSUPD, but there has been an African–American woman who served as an interim supervisor. Hodge also testified that she has not attempted to locate or discover organizations that are specific to law enforcement that could assist in diversifying the supervisory ranks of the WSUPD. She has also not met with any African–American leadership within the Wichita community nor any national organizations regarding diversifying the supervisory ranks of the WSUPD. But Hodge testified that the University has attempted to recruit a diverse work force by advertising in certain diverse publications, sending out job notices to organizations such as the Urban League, emailing the available job positions to different agencies, and visiting such organizations to recruit applicants.

### Plaintiff's Administrative Complaint

On September 6, 2005, plaintiff filed a complaint with the Kansas Human Rights Commission ("KHRC"). In this complaint, plaintiff alleged that on August 5, 2005, he was denied an interview for the Captain positions based on his race and in retaliation for participating in a co-worker's sexual harassment investigation. In this action, plaintiff does not bring a claim for retaliation based on his participation in the sexual harassment investigation. This is the only complaint that plaintiff has filed with KHRC.

### Plaintiff's Discipline in February 2006

In February 2006, plaintiff received a written reprimand for misusing University resources in the form of duty time, a departmental computer, and copy machine to print Kansas Association of Public Employees ("KAPE") material. He admitted that he was on duty at the time, and that he did not ask permission to create and distribute the documents. Chief Dotson had previously sent two emails to police department personnel stating that office equipment was for business-related use only. Plaintiff's use of the office equipment to print the KAPE material was not business-related. Plaintiff filed a Request for Grievance asking that the written reprimand be reduced to a verbal reprimand. The grievance committee held a hearing regarding plaintiff's request, but upheld the discipline.

Plaintiff alleges that a Caucasian Safety and Security Officer was treated differently than he was in regard to discipline issued for losing evidence, specifically a bag of marijuana. Plaintiff was told by another individual that an unknown officer was only given a verbal reprimand for losing this evidence. However, plaintiff does not know the name of the officer nor has he seen the file. He has only heard

about this incident. Plaintiff also asserts that a Caucasian dispatcher was not disciplined for printing off homework. This dispatcher reported to a different supervisor than the plaintiff's, and plaintiff does not know if that supervisor was aware that the dispatcher was printing off homework. Plaintiff testified that the dispatcher told him that her supervisor did not care if she printed off homework. Plaintiff further states that a traffic supervisor received a personal fax at work, but he does not know whether that employee's supervisor knew about the fax or whether he was disciplined. Plaintiff knew of another worker who printed off jokes at work. That worker was admonished and his personnel file was documented. Plaintiff knows of three other co-workers who have played video games at work or used the internet for personal use, but plaintiff does not know if their supervisors were aware of this conduct.

Plaintiff complained about the misuse of departmental equipment by other employees to Chief Dotson, who told plaintiff that there would be an investigation regarding these allegations. Plaintiff later asked the dispatcher, whom plaintiff had complained was printing off homework, whether anyone had spoken to her, and she told plaintiff that no one had approached her regarding the allegations.

Chief Dotson states that plaintiff is not the only employee who has received discipline for misuse of WSU property. Further, he is not aware of any employee who has engaged in similar conduct and has not been disciplined. Chief Dotson knows of three employees, two of whom are Caucasian and one of whom is African–American, who have received the same discipline as plaintiff for misusing University property.[5]

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[6] A fact is only material under this standard if a dispute over it would effect the outcome of the suit.[7] An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[8] The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[9]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[10] "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[11] The burden may

---

**5.** Plaintiff controverts these facts by arguing that defendant has not properly cited to the record. *See* D. Kan. R. 56.1(a) ("The facts ... shall refer with particularity to those portions of the record upon which the movant replies."). Defendant has omitted a citation, but these facts are found in the record in Chief Dotson's affidavit. (Doc. 36, Ex. B at 6.)

**6.** Fed.R.Civ.P. 56(c).

**7.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**8.** *Id.*

**9.** *Id.* at 251–52, 106 S.Ct. 2505.

**10.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**11.** *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir.2003) (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548).

be met by showing that there is no evidence to support the nonmoving party's case.[12] If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[13] When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[14]

### III. Analysis

#### A. Title VII Claims

Title VII of the Civil Rights Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...."[15] Plaintiff brings claims for disparate treatment and retaliation under Title VII alleging that defendant discriminated against him by failing to promote him to one of the Captain positions and by disciplining him for misusing department equipment.

#### 1. Exhaustion

■ Before addressing the merits of plaintiff's Title VII claims, the Court must determine whether all of plaintiff's claims have been properly exhausted through the required administrative process. "A plaintiff must exhaust his administrative remedies before bringing suit under Title VII...."[16] Otherwise, a court lacks jurisdiction to review Title VII claims that have not been exhausted.[17] "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate, actionable 'unlawful employment practice'" for which a plaintiff's administrative remedies must be exhausted.[18] "[U]nexhausted claims involving discrete employment actions" are not viable in a Title VII action.[19] The Tenth Circuit has explained that "requiring exhaustion of administrative remedies serves to put an employer on notice of a violation prior to the commencement of judicial proceedings. This in turn serves to facilitate internal resolution of the issue rather than promoting costly and time-consuming litigation."[20]

In this case, it is undisputed that plaintiff has filed only one administrative complaint. Plaintiff's complaint, filed on September 6, 2005 with the KHRC, alleged that on August 5, 2005, he was denied an interview for the Captain positions based on his race and in retaliation for participating in a co-worker's sexual harassment investigation. It is also undisputed that plaintiff is not bringing a claim for retaliation for his participation in the sexual harassment investigation. Rather, plaintiff brings claims for disparate treatment and retaliation based on the discipline that

**12.** *Id.*

**13.** *Id.*

**14.** *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**15.** 42 U.S.C. § 2000e–2(a)(1).

**16.** *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir.1997) (citations omitted).

**17.** *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1238 (10th Cir.2004) (citing *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir.1997)).

**18.** *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir.2003) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

**19.** *Id.*

**20.** *Id.* at 1211.

he received in February 2006 for misuse of department equipment, almost six months after he filed his only administrative complaint. This incident is a "discrete incident[ ] of [an] unlawful employment practice[ ] and subject to the requirement of administrative exhaustion."[21] Because plaintiff never filed an additional administrative complaint alleging discrimination or retaliation based on the February 2006 discipline, his claims based on this incident are unexhausted. Therefore, this Court does not have jurisdiction over those claims.

Plaintiff argues that he is entitled to bring claims for new conduct, occurring after the filing of the administrative charge, so long as it is "like or reasonably related to the allegations of the [administrative] charge."[22] However, the Tenth Circuit has made clear that this continuing violation theory, as described in *Ingels,* has been abrogated by its holding in *Martinez v. Potter.*[23] Plaintiff cites to only one post-*Martinez* case to support his argument, *Mitchell v. City and County of Denver.*[24] In that case, the Tenth Circuit applied the continuing violation theory to determine whether plaintiff's EEOC claim included a hostile work environment claim.[25] The Supreme Court stated in *National R.R. Passenger Corp. v. Morgan*[26] that because an "entire hostile work environment encompasses a single unlawful employment practice," such a claim may include acts taking place after the filing of an administrative charge so long as the acts contribute to that same hostile work environment.[27] But in *Martinez,* the Tenth Circuit distinguished acts taking place after the filing of an administrative charge that contribute to a hostile work environment from separate and discrete acts that occur after the charge is filed.[28] Here, plaintiff does not bring a hostile work environment claim. Rather, he brings disparate treatment and retaliation claims based on a discrete act— the discipline in February 2006—that requires administrative exhaustion and is "unrelieved by [the Tenth Circuit's] prior doctrine which excused the exhaustion requirement for acts reasonably related to the acts included in the administrative charge."[29] Thus, the Court dismisses plaintiff's claims based on plaintiff's disci-

---

**21.** *Dunlap v. Kan. Dep't of Health & Env't,* 127 Fed.Appx. 433, 438 (10th Cir.2005).

**22.** *Ingels v. Thiokol Corp.,* 42 F.3d 616, 625 (10th Cir.1994).

**23.** 347 F.3d at 1210. The Tenth Circuit has explained:

> In *Martinez,* we abrogated the continuing violation exception to our jurisdictional requirements to allege a claim of retaliation and held that "unexhausted claims involving discrete employment actions are no longer viable." In so doing, we relied on *National R.R. Passenger Corp. v. Morgan,* which concluded that each discrete retaliatory action constitutes its own "unlawful employment practice for which administrative remedies must be exhausted," and we applied *Morgan* to incidents occurring after an employee's filing of an EEO complaint.

*Annett v. Univ. of Kansas,* 371 F.3d 1233, 1238 (10th Cir.2004) (citations omitted).

**24.** 112 Fed.Appx. 662 (10th Cir.2004).

**25.** *Id.* at 666–67.

**26.** 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

**27.** *Id.* at 117, 122 S.Ct. 2061; *see also Duncan v. Manager, Dep't of Safety, City & County of Denver,* 397 F.3d 1300, 1310 (10th Cir. 2005).

**28.** *Martinez,* 347 F.3d at 1211; *see also Duncan,* 397 F.3d at 1310 (explaining that under the Supreme Court's holding in *Morgan* and the Tenth Circuit's decision in *Martinez,* acts that occur after the filing of an administrative charge are encompassed by a hostile work environment claim).

**29.** *Dunlap v. Kan. Dep't of Health & Env't,* 127 Fed.Appx. 433, 438 (10th Cir.2005).

pline in February 2006, for failure to exhaust administrative remedies. As such, the only Title VII claim remaining in this action is plaintiff's disparate treatment claim for failure to promote.

## 2. Disparate Treatment Claim for Failure to Promote

Plaintiff spends several pages in his response discussing a mixed-motive proof of analysis to show discrimination and argues that summary judgment is inappropriate in this case because there is evidence that plaintiff's race was a motivating factor in defendant's failure to promote him. However, plaintiff has not brought a claim based on a mixed-motive theory. Rather, this is a disparate treatment claim that, as stated in the Pretrial Order, requires plaintiff to show that defendant's decision not to promote him "was based on plaintiff's race."[30] The Pretrial Order "measures the dimensions of the lawsuit, both in the trial court and on appeal."[31] Absent any motion to amend or modify the Pretrial Order, plaintiff cannot include a mixed motive claim in this action.[32] Thus, the Court will apply the appropriate standard to analyze plaintiff's disparate treatment claim by employing the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*[33] and *Texas Department of Community Affairs v. Burdine.*[34] Under this framework, plaintiff must first prove a prima facie case of discrimination.[35] If plaintiff is able to sustain this burden, the burden of production shifts to defendant to "articulate a legitimate, nondiscriminatory reason for rejection."[36] If defendant sustains this burden, the burden of production shifts back to plaintiff to show that defendant's proffered reason for rejection is false, or merely a pretext, and the presumption of discrimination created by establishing a prima facie case " 'drops out of the picture.' "[37] Although the burden of production shifts back and forth between the parties, the ultimate burden of persuasion remains at all times with plaintiff.[38]

Establishing a prima facie case is "not an onerous burden," and gives rise to an inference of discrimination by eliminating the most common nondiscriminatory reasons for plaintiff's treatment.[39] Plaintiff alleges that defendant failed to promote him to one of the open Captain positions because of his race. To establish a prima facie case for failure to promote

**30.** (Pretrial Order, Doc. 33 at 28 (listing the elements of plaintiff's Title VII claim for failure to promote).)

**31.** *Hullman v. Bd. of Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir.1991) (quotation omitted).

**32.** The Court notes that even if it were to apply a mixed motive theory to plaintiff's claims, as shown below, there is no evidence in the record that defendant's actions were motivated even in part by a discriminatory animus. *See Burnett v. Southwestern Bell Tele., L.P.*, 471 F.Supp.2d 1121, 1139 (D.Kan. 2007) (finding that circumstantial evidence did not show that a retaliatory motive played a motivating part in terminating plaintiff's employment).

**33.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**34.** 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**35.** *Id.* at 252–53, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

**36.** *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

**37.** *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

**38.** *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

**39.** *Id.* at 254, 101 S.Ct. 1089.

under Title VII, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the promotion; (3) he was not promoted; and (4) the position for which he was not hired was filled or remained open.[40] Defendant concedes that plaintiff can establish the first, third, and fourth elements of a prima facie case, but defendant argues that plaintiff was not qualified for the Captain positions, and therefore, summary judgment must be granted.

■ In order for an applicant to be qualified for the Captain positions, he or she must have met the state's minimum qualifications which included a high school diploma or equivalent, a valid driver's license, and five years experience in general law enforcement, including two years of supervisory experience. The minimum requirements also allowed education in criminal justice, fire science, or law enforcement to be substituted for supervisory experience. Hodge, acting as the vacancy coordinator in the application process, reviewed all of the applications for the Captain positions and determined if each applicant met the minimum qualifications. Hodge understood the minimum qualifications to require that an applicant have at least two years of supervisory experience over commissioned law enforcement officers. As plaintiff points out, the language of the state minimum qualifications does not explicitly state that the supervisory experience must be over "commissioned law enforcement officers." However, that is how Hodge interpreted the minimum requirement of "five years experience in general law enforcement, including two years of administrate [sic] or supervisory experience." And she applied this same standard to each application for the Captain positions.

After reviewing plaintiff's application, Hodge determined that he did not meet the minimum qualifications for the positions as provided in the state specifications because plaintiff did not have two years supervisory experience over commissioned law enforcement officers. Hodge testified that an application must clearly "spell out" exactly what type of supervisory experience the applicant possesses, and plaintiff's application lacked any indication that he possessed the required two years of supervisory experience. Plaintiff's application lists that he has served for five years as a police officer for the WSUPD, but he has never held a position as sergeant, lieutenant, captain, or any other supervisory role over commissioned police officers. While plaintiff contends his resume was "very clear" that he had filled in as an "acting supervisor" during his employment with the WSUPD, his application does not provide such information. In fact, where the application states "Number of Employees Supervised," plaintiff's submitted response was "0." Plaintiff's application also mentions his experience in the Air National Guard, but does not state that he supervised any employees in his position. Rather, the application describes his military duties as performing personnel actions and clerical functions. Further, plaintiff admitted in his deposition testimony that he had "no relevant supervisor experience" in a police force. Plaintiff's application does lists some supervisory experience, although it was not in a law enforcement capacity. Plaintiff stated that he supervised one employee when he worked as a security officer for Silva Security, but his application does not clearly indicate that this position included supervisory experience over general law enforcement. Instead, defendant described his duties in this position as "loitering/crowd control at

---

**40.** *Amro v. Boeing Co.,* 232 F.3d 790, 796 (10th Cir.2000).

QuikTrip." Plaintiff also stated on his application that he supervised four employees as a volunteer at Communities United Credit Union, and he attached a resume to his application in which he described managing employees in his fashion merchandising company. However, because this supervisory experience was not over commissioned law enforcement officers, Hodge determined that this experience did not meet the state's minimum qualification of "five years experience in general law enforcement, including two years of administrate [sic] or supervisory experience."

Hodge also determined that plaintiff did not have any relevant education in criminal justice, fire science or law enforcement that could be substituted for supervisory experience. Plaintiff concedes that he has no education in criminal justice, fire science, or law enforcement, other than training that he received at the Kansas Law Enforcement Training Center in order to become a commissioned officer with the WSUPD. While plaintiff contends that his MBA made him one of the most qualified applicants for the positions, the undisputed evidence shows that defendant was seeking applicants with law enforcement related education. Further, Chief Dotson testified that he does not believe that an MBA should be given weight when hiring law enforcement personnel. Based on all of the information included in plaintiff's application, Hodge determined that plaintiff did not meet the minimum requirements, and therefore he was not qualified for the Captain positions.

After reviewing forty-four applications, Hodge did determine that seven applicants possessed the minimum qualifications, as required by the state specifications, for the positions. All of these applicants had significant supervisory experience over commissioned law enforcement officers, previously serving in positions of sergeant or captain. Additionally, many of these seven applicants had additional education in law enforcement related fields. Once these seven applicants were determined to have the minimum qualifications, Chief Dotson applied the selection matrix criteria to the applicants in a consistent and objective manner. Morris, Hashenberger, and Patterson received the high scores, and they were granted interviews for the positions. After the interviews, Morris and Hashenberger received the highest scores, and they were offered the positions. Based on the evidence in the record, defendant applied the minimum requirements in a uniform manner to all of the applicants, and hired the applicants who met the requirements and received the highest scores under the selection matrix criteria and after the interview process. Plaintiff was not similarly situated with the seven applicants who were determined to be qualified because plaintiff did not possess the minimum qualifications necessary to be considered for the positions.

Plaintiff was, however, similarly situated with many officers at the WSUPD who were not interviewed for the positions because they, like plaintiff, did not meet the minimum qualifications. After reviewing the applications of Sergeant Catlin, Keller, and Mai, who were all employees of the WSUPD, Hodge determined that these officers were not qualified for the positions because each officer did not have at least two years of supervisor experience over commissioned law enforcement officers. Because plaintiff, like these other officers, did not possess the required two years supervisory experience over commissioned law enforcement officers, Hodge determined that plaintiff, along with these other officers, was not qualified for the positions.

■ Because plaintiff was not qualified for the positions, plaintiff cannot establish a prima facie case of disparate treatment. Therefore, the Court grants summary judgment in defendant's favor. However,

even if plaintiff were able to establish a prima facie case, there is no evidence of pretext in defendant's legitimate reason for not promoting plaintiff—that he was not qualified for the positions. " 'A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence.' "[41] Here, plaintiff points to three pieces of circumstantial evidence that he contends show pretext: (1) plaintiff met the minimum qualifications for the Captain positions; (2) the defendant has never had an African–American in a supervisory position; and (3) defendant implemented subjective criteria contrary to its established procedures in reviewing the applications for the positions.

First, plaintiff contends that Hodge testified that plaintiff did meet the "minimum qualifications" for the positions. However, in making this argument, plaintiff conflates the requirements listed in a University position description with the minimum requirements under the state specifications. This University position description, marked as Exhibit 1 in Hodge's deposition, lists certain general requirements including that an applicant be a United States citizen at least twenty-one years of age and have no felony convictions. When asked in the deposition whether plaintiff met the requirements of the University position description in Exhibit 1, Hodge

agreed that he did.[42] However, Hodge distinguished the requirements listed in Exhibit 1 from the minimum requirements in the state specifications that was marked as Exhibit 2.[43] When asked whether plaintiff met the minimum requirements of the state specifications as described in Exhibit 2, Hodge replied that he did not because plaintiff did not possess two years of supervisory experience.[44] As described above, Hodge determined from plaintiff's application that he did not have any supervisory experience over commissioned law enforcement officers, and therefore, he was not qualified for the positions. Contrary to plaintiff's assertion, there is no inconsistency in Hodge's testimony sufficient to show pretext regarding the determination that plaintiff did not meet the minimum qualifications for the job.

Second, plaintiff alleges that pretext is shown by the fact that defendant has never had an African–American employee in a supervisory position. The Tenth Circuit has stated that "[u]nder certain circumstances an inference of discrimination may sometimes be drawn from statistical evidence that no member of a protected group has ever occupied a particular job or position. Such evidence is often referred to as the 'inexorable zero.' "[45] However, " '[s]tatistics taken in isolation are generally not probative of . . . discrimination,' and statistical evidence on its own 'will rarely suffice' to show pretext."[46]

---

**41.** *Zamora v. Elite Logistics, Inc.,* 478 F.3d 1160, 1167 (10th Cir.2007) (quoting *Stinnett v. Safeway, Inc.,* 337 F.3d 1213, 1218 (10th Cir.2003)).

**42.** (Doc. 36, Ex. C at 121:8–11.)

**43.** (*Id.* at 92:23–93:21.)

**44.** (*Id.* at 91:1–7, 94:5–11.)

**45.** *Marion v. Slaughter Co.,* 202 F.3d 282, 1999 WL 1267015, at *2, 7 (rejecting plaintiff's proposed jury instruction regarding statistics to support her claim that defendant

engaged in a practice or policy of maintaining gender-based job categories); (citing *Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 524 n. 4 (7th Cir.1994); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

**46.** *Timmerman v. U.S. Bank, N.A.,* 483 F.3d 1106, 1114–15 (10th Cir.2007) (quoting *Jones v. Unisys Corp.,* 54 F.3d 624, 632 (10th Cir. 1995); *Ortiz v. Norton,* 254 F.3d 889, 897 (10th Cir.2001)).

"At the very least, in order to create an inference of pretext, 'a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals.' "[47] Additionally, the Court notes that statistical evidence has little probative value in cases alleging individual discrimination such as this.[48]

Here, plaintiff's proffered statistical evidence is wholly insufficient to establish pretext. As defendant points out, plaintiff does not provide any evidence of the number of supervisors in the history of the department, the number of applicants, the race of such applicants, whether minority applicants were offered and declined positions, or any other statistical evidence about the positions, the application process, the interviews, or the selection of supervisors. Further, plaintiff does not provide statistical evidence of disparate treatment between similarly situated individuals. The only evidence in the record to support this claim is Hodge's testimony that she is not aware of any African–Americans who have held a supervisory position and her testimony regarding steps that could be taken to diversify the police force. Chief Dotson testified, however, that while there has never been an African–American Captain in the WSUPD, there has been an African–American woman who served as an interim supervisor. Because this is the only evidence that plaintiff uses to support this argument, plaintiff fails to show a disparity in defendant's hiring practices based on statistical evidence, sufficient to establish discrimination or pretext.

In this section of his response brief, plaintiff also contends that Hodge testified that had the selection matrix criteria been applied to plaintiff, he would have scored 675 points, the highest score of all the applicants. Plaintiff blatantly misrepresents Hodge's deposition testimony with this statement. In the deposition, plaintiff's attorney attempted to have Hodge hypothetically apply the selection matrix criteria to plaintiff. When plaintiff's attorney attributed points to plaintiff based on his educational and supervisory experience, Hodge repeatedly stated that plaintiff would not receive such points when his experience was not law enforcement related.[49] After defense counsel raised several objections, plaintiff's attorney stated that he was not asking "trick questions" but asked Hodge to apply the selection matrix criteria so that an applicant would receive points for any type of educational or supervisory experience.[50] Under such speculative application, plaintiff may have received 675 points. However, the uncontroverted evidence in the record shows that this was not the manner in which the selection matrix criteria was applied. First, the selection matrix criteria was only applied to applicants who met the minimum qualifications. Since plaintiff did not meet the minimum qualifications, Chief Dotson did not apply the criteria to plaintiff. Second, Chief Dotson only awarded points under the selection matrix criteria for educational or supervisory experience related to law enforce-

**47.** *Id.* (quoting *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991)).

**48.** *Id.* at 1115–16 (citing *Baylie v. Fed. Reserve Bank,* 476 F.3d 522, 524 (7th Cir.2007) ("In individual [discrimination] cases, studies of probabilities are less helpful."); *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 848 (1 st Cir.1993) ("[A] company's overall employ-ment statistics will have little direct bearing on the specific intentions of the employer when dismissing a particular individual.")).

**49.** (Doc. 36, Ex C at 153:8–22, 155:1–4, 156:4–8.)

**50.** (*Id.* at 158:8–18.)

ment. Since plaintiff did not possess such experience, he would not have been awarded points even if the selection matrix criteria had been applied to him.

Finally, plaintiff argues that defendant applied subjective criteria, contrary to its established procedures, when reviewing the applications for the positions. Plaintiff alleges that Hodge took the objective criteria of the minimum requirements and inserted a subjective component when she interpreted the supervisory requirement as supervision over "commissioned law enforcement." From this, plaintiff argues that Hodge could have applied any of the requirements in a subjective way to exclude African–American applicants. However, there is no evidence of this type of subjective application in the record. Rather, the record is clear that Hodge applied the same standard to all of the applications for the Captain positions, requiring that each applicant have two years supervisory experience over commissioned law enforcement officers. Further, there is no evidence that Hodge applied any of the minimum requirements to the applications in such a way as to exclude African–American applicants. Therefore, there is no evidence that defendant's proffered reason for plaintiff's termination was pretextual. As such, summary judgment is granted in defendant's favor on plaintiff's Title VII claims.

## B. 42 U.S.C. § 1981 Claim

■ Plaintiff also brings a discrimination claim against defendant under 42 U.S.C. § 1981. Defendant argues that it is entitled to sovereign immunity, and therefore plaintiff's § 1981 claim must be dismissed. The Court agrees. Eleventh Amendment immunity provides protection for state governmental entities sued in federal court for damages unless the state waives its immunity.[51] It is "well established that the universities established by the State of Kansas and governed by the Kansas Board of Regents function as alter ego agencies of the state and share its Eleventh Amendment immunities."[52] Defendant WSU is an agency of the State of Kansas, and entitled to Eleventh Amendment immunity.[53] And this immunity bars plaintiff from bringing a claim under § 1981.[54] Therefore, this Court lacks subject matter jurisdiction over this claim.

Plaintiff argues that the State of Kansas has waived its immunity by expressly consenting to suit through the enactment of K.S.A. § 75–6103 of the Kansas Tort Claims Act ("KTCA").[55] That section provides: "[s]ubject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."[56] However, K.S.A. § 75–

---

**51.** *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (superceded by statute on other grounds).

**52.** *Billings v. Wichita State University,* 557 F.Supp. 1348, 1350 (D.Kan.1983) (citations omitted).

**53.** *See Jones v. Wichita State University,* No. 06–2131–KHV, 2007 WL 926075, at *2 (D.Kan. Mar.28, 2007) (citing K.S.A. § 76–711(a); K.S.A. § 76–712); *see also Taher v.*

*Wichita State University,* No. 06–2132–KHV, 2007 WL 852364, at *2 (D.Kan. Mar.19, 2007) (same).

**54.** *See Baker v. Bd. of Regents of the State of Kan.,* 721 F.Supp. 270, 274 (D.Kan.1989) (lawsuits under 42 U.S.C. §§ 1981 and 1983 are not exempt from the Eleventh Amendment bar).

**55.** K.S.A. § 75–6101–6120.

**56.** K.S.A. § 75–6103(a).

6116(g) of the KTCA explicitly states that "[n]othing in this section or in the Kansas tort claims act shall be construed as a waiver by the state of Kansas of immunity from suit under the 11th amendment to the constitution of the United States." Further, several courts have held that the Kansas Legislature, by enacting the Kansas Tort Claims Act, has not waived the state's Eleventh Amendment immunity from suit in federal court.[57] Therefore, because defendant is entitled to immunity, summary judgment is granted in favor of defendant on plaintiff's § 1981 claim.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 35) is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant's Motion to Determine Wichita as Place of Trial (Doc. 41) is denied as moot.

**IT IS SO ORDERED.**

---

**57.** *See e.g., Jones,* 2007 WL 926075, at *2; *Taher,* 2007 WL 852364, at *2; *Ndefru v. Kan.* *State Univ.,* 814 F.Supp. 54, 55 (D.Kan.1993); *Billings,* 557 F.Supp. at 1351.